# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Diane Bass and Otis Bass, Individually and as Parents and Guardians of Alex B., a minor under the age of ten (10) years, and Hanna B., a minor under the age of ten (10) years, Petitioners,

v.

South Carolina Department of Social Services, Respondent.

Appellate Case No. 2013-001332

_____

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

_____

Appeal From Fairfield County
R. Ferrell Cothran, Jr., Circuit Court Judge

_____

Opinion No. 27593
Heard March 17, 2015 – Filed December 2, 2015

_____

## REVERSED

_____

Lee Deer Cope, of Peters Murdaugh Parker Eltzroth & Detrick, PA, of Hampton; John K. Koon and Jamie L. Walters, of Koon & Cook, PA, of Columbia, all for Petitioners.

Patrick John Frawley, of Davis Frawley, LLC, of Lexington, for Respondent.

**CHIEF JUSTICE TOAL:**    Diane and Otis Bass, individually and on behalf of their minor children (collectively, Petitioners), appeal the court of appeals' decision reversing a jury verdict in their favor against the South Carolina Department of Social Services (DSS) for gross negligence and outrage in connection with a DSS investigation. *See Bass v. S.C. Dep't of Soc. Servs.*, 403 S.C. 184, 742 S.E.2d 667 (Ct. App. 2013). We reverse.

## FACTUAL/PROCEDURAL HISTORY

Diane and Otis Bass are married and have three children: Brittany, Hanna, and Alex. All three children have special needs, but Hanna and Alex are also autistic. Otis works outside the home, and Diane cares for the children.

Due to their forms of autism and their other cognitive issues, both Hanna and Alex were prescribed Clonidine to help them sleep at night, in addition to other medications. A compounding pharmacy filled the Clonidine prescription. In April 2008, the prescription was inadvertently mixed at one thousand times the recommended concentration.

On the evening of May 11, 2008, Diane administered the wrongly compounded Clonidine to Hanna. During her bath that evening, Hanna "went blank," "[h]er eyes turned around in the back of her head, and her skin turned cold." Diane took Hanna to Fairfield Memorial Hospital, but she was not admitted. Two days later, Hanna became lethargic, so Diane took her to their family doctor. At that time, the family doctor sent Hanna to Palmetto Richland Memorial Hospital (Richland Memorial) in Columbia due to his concern over Hanna's lethargy and respiratory issues, and Hanna was admitted.

On May 15, Alex became ill after taking the Clonidine. Diane took him to the family doctor. The nurse practitioner on call testified that Alex was very ill upon arrival. Alex was transported via ambulance to Fairfield Memorial Hospital, and then via helicopter to Richland Memorial and placed on life support.

That same day, DSS received a report that two special needs children were in the hospital due to "possible poisoning by parents." The agency assigned an overall danger rating of "medium" to the case because while Hanna and Alex were very young—seven and three at the time, respectively—they were not in imminent

danger while they were in the hospital. Nonetheless, the "medium" danger rating mandated that a DSS employee respond to the report and initiate an investigation within twenty-four hours. Caseworker Monique Parrish arrived at the hospital within forty-five minutes after DSS received the report.

At the hospital, Parrish spoke to Otis, who "had no idea what was going on." She also questioned the oldest child, Brittany, who told Parrish that Diane "poured medicine in soda and gave it to Alex and Hanna," and that they became ill shortly thereafter. Moreover, the hospital staff speculated to Parrish that the children had been overly medicated. Parrish took the bottle of medicine, but did not arrange to have it tested and did not otherwise investigate its contents. After observing Hanna and Alex, Parrish asked Diane and Otis to meet her at the DSS office the next morning.

On May 16, after a family meeting with Diane, her sisters, and her niece, Parrish determined the children should be removed from the Bass home and placed with Diane's sister, Linda.[1] Diane and Otis signed a safety plan to this effect,[2] and Linda took custody of the three children.[3] Diane and Otis were permitted to visit the children "whenever they wanted" so long as Linda was present during the visit.

---

[1] Prior to this placement, Parrish performed the requisite home visit and background check. However, Parrish did not investigate whether Linda could address the children's special care requirements, instead relying on Diane's assurances that Linda was capable of addressing the children's basic needs.

[2] At trial, it was heavily disputed whether Diane and Otis voluntarily signed the safety plan. Some of the testimony indicated that Parrish informed Diane and Otis that their children would be separated and placed in foster care if DSS could not achieve placement with a relative. However, DSS's expert testified that Diane and Otis could have refused to sign the safety plan, at which time DSS would have been required to seek a court order to place the children.

[3] Linda testified that she understood the placement to be temporary, but she testified that DSS never attempted to return the children to their parents, even after she inquired about alternative placement due to Alex's and Hanna's special needs and the stress incumbent upon their care. Instead, Hanna was placed with another relative.

On May 20, in compliance with DSS policy, Parrish held a five-day staff meeting with other DSS employees, during which they determined that Diane and Otis were unfit parents.

On June 17, Linda received a telephone call from the compounding pharmacy's insurer concerning the improperly filled Clonidine prescription. Linda notified DSS, and the agency subsequently concluded that the medication was the cause of the children's hospitalization. This revelation led to the eventual return of the children to Diane and Otis. However, DSS continued to make announced and unannounced visits at the Bass home through the end of 2008 and still refuses to remove its finding that Diane and Otis "harmed their children" from the agency's file on Petitioners.

Petitioners filed a lawsuit against DSS, the compounding pharmacy, and the pharmacist, alleging negligence and gross negligence, and seeking actual and punitive damages. In May 2011, after settling with the pharmacy and the pharmacist, Petitioners served DSS with an amended complaint. In their amended complaint, Petitioners alleged causes of action for gross negligence, defamation, and outrage, and sought actual damages. In its answer, in addition to a general denial, DSS asserted affirmative defenses under the South Carolina Tort Claims Act (the TCA),[4] as well as the affirmative defenses of comparative negligence, negligence of a third party, legal privilege and justification, qualified privilege, and with respect to the defamation and outrage causes of action, failure to state a claim upon which relief can be granted.

Trial testimony established that DSS cannot remove a child unless there is an unreasonable safety threat to the child, and that the standard practice is to keep children in the home when possible. Moreover, in cases involving potential medical neglect, DSS caseworkers must consider medical evidence. To that end, Parrish testified that in order to complete a medical neglect investigation, a caseworker must communicate with medical treatment providers, and that children cannot be removed from the home without fact-finding to substantiate the medical claim.

---

[4] *See* S.C. Code Ann. § 15-78-30(f) (Supp. 2014) (defining "loss" and failing to include "outrage" as method of recovery under the TCA); S.C. Code Ann. § 15-78-60(3), (4), (5), (20), (25) (Supp. 2014) (detailing specific actions that a governmental entity is not liable for should a loss occur). *See also generally* S.C. Code Ann. §§ 15-78-10 to -220 (Supp. 2014) (containing the entire TCA).

Despite these prerequisites to removing a medically neglected child from the home, Parrish testified that she "did not look into the poisoning," but instead "wait[ed] for the lab results."[5] Parrish acknowledged that she did not speak to a doctor about the children's illnesses or the lab results, yet she based the removal of the children solely on the possibility that the children had been poisoned by medication.

Parrish stated that she did not consider her investigation "complete" because she never attempted to investigate the reasons for the potential poisoning by medication other than to wait for the lab results. Similarly, because the case involved a potential poisoning, Parrish's supervisor testified that DSS should have done more to investigate the medication, such as contacting the pharmacy or Poison Control.

Parish testified further that she was unable to conduct a thorough investigation because she was unwell after a recent neck surgery, and was taking pain medication that affected her ability to perform her job functions. Specifically, Parrish stated that at the time of the investigation, she was experiencing substantial physical pain and was barely able to complete simple tasks such as typing or even walking. Parrish testified that although she was supposed to be on light work duty at the DSS office, her supervisor threatened her job and forced her to do field work on Petitioners' case instead.[6]

In an attempt to justify the removal, Parrish testified that when she and another DSS employee inspected the Bass home on May 20, they found it to be in "disrepair."[7] In addition, Parrish testified that Diane had recently been diagnosed with diabetes, and that she had confessed to Parrish that she sometimes experienced feelings of "sadness," "hopelessness," and was "often overwhelmed."[8]

_____

[5] There is some indication in the Record that the toxicology testing was inconclusive; however, the Record does not indicate what testing was performed.

[6] Parrish's supervisor disputed Parrish's claim of debilitating illness.

[7] Conversely, DSS's expert testified that the condition of the home did not present an immediate threat of harm to the children.

[8] However, Parrish admitted that Diane's personal feelings were not grounds for

Despite these purported grounds for removal, this information was not known to DSS when the agency removed the children for medical neglect.

Petitioners' expert, Michael Corey, is a social worker and consultant who has assisted states in implementing safety assessment models for investigation and treatment by child protective services. He opined to a reasonable degree of certainty that DSS did not exercise slight care under these circumstances. Corey testified that DSS has a duty to investigate allegations of abuse and neglect and the agency can do so negligently, gross negligently, or "competent[ly]." Corey testified that Parrish's initial response at the hospital was "very good" and that she properly provided Diane and Otis with a brochure explaining their rights and held a family meeting; therefore, Corey found that Parrish exercised care in responding to the report and at the beginning of her investigation. However, he opined that DSS should have only sought placement in a relative's home after determining that the children were not safe in their own home, and that DSS was grossly negligent in failing to conduct a proper investigation into the poisoning claims, and therefore was grossly negligent in removing the children from the home.

Corey specifically pointed to the following evidence to support his opinion that DSS was grossly negligent: (1) Parrish, by her own testimony, was not capable of conducting the investigation due to her extreme pain and medication; (2) After Diane and Otis stated that they did not know what happened to their children except that they administered the medication, Parrish removed the children from the home without an investigation into the medication; (3) Parrish did not interview or speak to any of the children's doctors, including Petitioners' family doctor; (4) Because DSS gave Diane and Otis a choice between removal to foster care or placement with family members and DSS did not consider whether the children would be safe in their own home, DSS coerced Diane and Otis into signing the safety plan; (5) Parrish did not inquire into the condition of Petitioners' home before making a decision that the children should be removed; (6) DSS asked for a list of the children's medical providers for the first time on May 30; and (7) Parrish did not investigate Diane's medical condition before assuming that her condition harmed the children.

In rebuttal, DSS called its former director, Jocelyn Goodwyn, as an expert in "certain aspects of [c]hild [p]rotective [s]ervices." Like Corey, Goodwyn testified that DSS had acted appropriately in its initial response, and upon review of the file,

removal.

testified that DSS properly gave Diane and Otis the DSS brochure and handbook explaining their rights under the law; held a family meeting; conducted an alternative site visit at Linda's home; entered a safety plan with Diane, Otis, and relative caregivers; held a staffing meeting within five days to consider the case; investigated Petitioners' home on May 20; and interviewed Diane, Otis, and family members. Therefore, Goodwyn opined that there was no evidence that DSS acted in "bad faith."

However, under cross-examination, Goodwyn admitted that DSS is required to conduct a thorough investigation before removing children from their parents, and DSS did not do so in this case. In addition, Goodwyn testified that there was no evidence that Diane and Otis harmed the children or that the children were in imminent risk of harm. In short, Goodwyn conceded that the removal should not have occurred "when it did."

The remaining evidence at trial established that Diane and Otis loved their children and attended to all of their medical needs. Moreover, Diane and Otis spent all of their free time with their children, and the children had never spent the night away from their parents prior to their removal by DSS. Aside from being separated from the children, Petitioners presented evidence that Diane and Otis were injured by the implication that they would harm their children, even though they were regarded by family and others, including their family doctors, as excellent parents. Further, Alex and Hanna cried because they missed their parents during their removal, and Hanna no longer enjoyed a close relationship with Linda upon her return to her parents. A child psychologist opined that Hanna would require therapy to overcome emotional trauma and other resulting problems caused by the removal, although Hanna's autism contributed to this diagnosis.

DSS moved for a directed verdict at the conclusion of Petitioners' case, and again at the conclusion of all of the evidence. The trial judge denied both motions. At the conclusion of the evidence, Petitioners withdrew their defamation cause of action, and moved for a directed verdict regarding DSS's defenses of discretionary immunity and negligence of a third party. The trial judge granted Petitioners' motions for directed verdict as to those defenses.

Ultimately, the jury returned a verdict for Petitioners, and awarded them $4 million in damages. DSS subsequently filed motions for judgment notwithstanding the verdict (JNOV), for new trial absolute, and to reduce the verdict. The trial court issued an order denying DSS's post-trial motions. However, the trial court

granted DSS's motion to reduce the verdict in accordance with the TCA's limitations on damages.[9] DSS filed a timely notice of appeal.

The court of appeals reversed the jury's verdict. *See Bass*, 403 S.C. at 184, 742 S.E.2d at 667. First, the court of appeals found the trial court erred in refusing to grant DSS's motion for JNOV because there was no evidence in the record that DSS acted with gross negligence in conducting the investigation. *Id.* at 190, 742 S.E.2d at 670. The court of appeals found the twenty-four hour time constraint associated with the medium danger rating to be particularly instructive. *Id.* at 192, 742 S.E.2d at 671 (citing *Spartanburg Cnty. Dep't of Soc. Servs. v. Little*, 309 S.C. 122, 125, 420 S.E.2d 499, 501 (1991)). During this initial period, the court of appeals noted that (1) Parrish interviewed family members and learned the children became ill after Diane administered prescription medicine to the children; (2) Parrish obtained Diane's and Otis's consent to have the children's medical information released to DSS; and (3) Parrish procured the children's toxicology report, which was inconclusive. *Id.* Thus, the court of appeals found that DSS's investigation into the possible poisoning, "[w]hile far from perfect," demonstrated the exercise of slight care. *Id.* at 191, 742 S.C. at 671.

In so holding, the court of appeals found Corey's opinion that DSS failed to exercise slight care insufficient to defeat DSS's motion for JNOV because the record was "devoid of any indication that Corey in any way took into account the expediency with which DSS must investigate claims of abuse and neglect." *Id.* at 191–92, 742 S.E.2d at 671. Therefore, the court of appeals found "Corey failed to establish his opinion was based upon a proper statement of DSS's duty," and his opinion "could not, without more, defeat DSS's motion for JNOV." *Id.* at 192, 742 S.E.2d at 671 (citation omitted).

Finally, in reversing the trial judge's refusal to grant JNOV as to the outrage claim, the court of appeals held that, because it determined DSS was not grossly negligent, Petitioners' outrage claim must fail. More specifically, the court of appeals held that as a matter of law, DSS's conduct could not be reckless if the conduct was not found to be at least grossly negligent. *Id.* at 193, 742 S.E.2d at 672 (citations omitted).[10]

---

[9] *See* S.C. Code Ann. § 15-78-120 (Supp. 2014).

[10] The court of appeals found DSS's argument that the trial court erred in denying the JNOV motion because Diane and Otis voluntarily participated in the placement

We granted Petitioners' petition for a writ of certiorari to review the decision of the court of appeals.

**ISSUES**

I.      Whether the court of appeals erred in finding that the trial court should have granted DSS's motion for JNOV?

II.     Whether the court of appeals erred in reversing the verdict as to the outrage claim?

**STANDARD OF REVIEW**

In ruling on directed verdict or JNOV motions, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions. *Sabb v. S.C. State Univ.*, 350 S.C. 416, 427, 567 S.E.2d 231, 236 (2002) (citing *Steinke v. S.C. Dep't of Labor, Licensing & Regulation*, 336 S.C. 373, 520 S.E.2d 142 (1999)). "[T]he trial judge is concerned with the existence of evidence, not its weight." *Curcio v. Caterpillar, Inc.*, 355 S.C. 316, 320, 585 S.E.2d 272, 274 (2003). Similarly, on appeal, "[t]he jury's verdict must be upheld unless no evidence reasonably supports the jury's findings." *Id.* at 320, 585 S.E.2d at 274 (citing *Horry Cnty. v. Laychur*, 315 S.C. 364, 434 S.E.2d 259 (1993)). Moreover, neither an appellate court nor the trial court has authority to decide credibility issues or to resolve conflicts in the testimony or the evidence. *Garrett v. Locke*, 309 S.C. 94, 99, 419 S.E.2d 842, 845 (Ct. App. 1992).

**LAW/ANALYSIS**

**I. Gross Negligence**

Petitioners ask this Court to reverse the decision of the court of appeals because under the applicable standard of review, the court of appeals was required to accept the jury verdict unless there was no evidence in the record that DSS acted with gross negligence. DSS argues that because the evidence only yielded one

_____

of the children unpreserved, and DSS did not appeal this finding. *Bass*, 403 S.C. at 192, 742 S.E.2d at 671 (citation omitted).

reasonable inference—that DSS exercised slight care—the court of appeals' decision should be upheld.

As an initial matter, we find as a matter of law that DSS did not act in a grossly negligent manner in the Emergency Protective Custody (EPC) removal of the poisoned children. EPC removal is typically associated with exigent circumstances and time constraints. Thus, this opinion should not be read to impose on DSS a duty to conduct the post-EPC investigation in a pre-EPC setting. However, because DSS's post-EPC investigation presented a jury question on the issue of gross negligence, we reverse the court of appeals.

Under the TCA, a "governmental entity is not liable for a loss resulting from . . . responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student, patient, prisoner, inmate, or client of any governmental entity, *except when the responsibility or duty is exercised in a grossly negligent manner*." S.C. Code Ann. § 15-78-60(25) (emphasis added).

"Gross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." *Etheredge v. Richland Sch. Dist. One*, 341 S.C. 307, 310, 534 S.E.2d 275, 277 (2000) (citing *Clyburn v. Sumter Cnty. Dist. Seventeen*, 317 S.C. 50, 451 S.E.2d 885 (1994); *Richardson v. Hambright*, 296 S.C. 504, 374 S.E.2d 296 (1988)). In other words, "[i]t is the failure to exercise slight care." *Id.* at 310, 534 S.E.2d at 277 (citation omitted). "Gross negligence has also been defined as a relative term, and means the absence of care that is necessary under the circumstances." *Id.* (citing *Hollins v. Richland Cnty. Sch. Dist. One*, 310 S.C. 486, 427 S.E.2d 654 (1993)). Normally, the question of what activity constitutes gross negligence is a mixed question of law and fact. *Id.* However, "when the evidence supports but one reasonable inference, the question becomes a matter of law for the court." *Id.* (citation omitted).

### *Expert Testimony*

Petitioners first argue that the court of appeals erred in holding that Corey's expert opinion lacked a sufficient evidentiary basis. We agree.

In finding Corey's opinion was not based on a proper statement of DSS's duty, the court of appeals relied on *Harris Teeter, Inc. v. Moore & Van Allen, P.L.L.C.*, a professional malpractice case. *See* 390 S.C. at 275, 701 S.E.2d at 742.

There, the Court found that summary judgment was appropriate because the plaintiff's experts failed to define the correct legal standard of care or opine specifically how the defendants breached the standard of care. *Id.* at 289, 701 S.E.2d at 749. For example, when asked about the definition of standard of care upon which he relied to form his opinion, one of the experts responded, "It's my standard." *Id.* He further explained that his standard was that "of someone reading this at the end of the case," or "that of a businessman's lawyer." *Id.* Thus, the Court found that because the expert did not accurately portray the proper standard of care, his conclusory statement that the defendants breached the standard of care did not create a genuine issue of material fact. *Id.*

Similarly, the plaintiff's second expert in *Harris Teeter* testified that the legal malpractice standard of care is a determination of what a "reasonably competent lawyer [would] do given the facts and situations they were handed." *Id.* While the Court agreed that this "generic" statement was "true in the abstract," it found that the expert's testimony about how the defendants breached the standard of care was too general. *Id.* at 290–91, 701 S.E.2d at 749–50. Thus, the Court found that this expert's testimony likewise did not create a genuine issue of material fact. *Id.* at 291, 701 S.E.2d at 750.

Unlike the experts in *Harris Teeter*, in this case, Corey stated the proper standard of care and provided specific examples to support his opinion that DSS breached the standard of care. Therefore, we find the court of appeals erred in relying on *Harris Teeter* to discredit Corey's expert testimony and in finding that his testimony lacked a sufficient evidentiary foundation. *Cf. Carter v. R.L. Jordan Oil Co.*, 294 S.C. 435, 441, 365 S.E.2d 324, 328 (Ct. App. 1988) (stating "[a]n expert is given wide latitude in determining the basis of his testimony"), *rev'd on other grounds*, 299 S.C. 439, 385 S.E.2d 820 (1989).

### *Evidence of Gross Negligence*

Having determined that the court of appeals erred in discrediting Corey's testimony, we must next decide if there was any evidence in the record to support the jury's verdict. *See Curcio*, 355 S.C. at 320, 585 S.E.2d at 274 (stating that in deciding a motion for JNOV, "the trial judge is concerned with the existence of evidence, not its weight"). Petitioners argue that Corey's testimony constituted sufficient evidence in the record to support the jury finding that DSS was grossly negligence. In addition, Petitioners argue that, notwithstanding Corey's testimony, there was ample evidence in the record to support the jury verdict. We agree.

As an initial matter, we find the court of appeals misapprehended Parrish's trial testimony in finding that Corey's testimony did not constitute evidence of gross negligence. Rather than testifying that she had twenty-four hours to *conduct* the initial investigation, Parrish testified that she had twenty-four hours to *respond* to the initial report.

Therefore, Corey agreed with DSS that the agency exercised care in its initial response to the report, testifying that Parrish's response to the intake was "very good," in that Parrish arrived at the hospital within forty-five minutes, properly provided Petitioners with copies of required DSS brochures, conducted the required family meeting, and performed the required home study on Linda before placing the children with her. Where Corey found fault with DSS's investigation was in DSS's failure to conduct a post-EPC investigation into the stated reason for the children's removal from the home—potential poisoning by prescription medication. For example, Corey noted that Parrish failed to interview the children's doctors, other medical staff at the hospital, or their family doctor who initially treated the children, and failed to investigate the medication after being told that the children fell ill shortly after Diane administered the Clonidine to them. Thus, we find that the court of appeals improperly found that Corey's testimony did not constitute evidence of DSS's gross negligence.

Moreover, because there was other evidence in the record that DSS was grossly negligent with respect to the post-EPC investigation, we find that the court of appeals placed undue weight on Corey's expert testimony. *See Berkeley Elec. Co-op, Inc. v. S.C. Pub. Serv. Comm'n*, 304 S.C. 15, 20, 402 S.E.2d 674, 677 (1991) (stating "[w]here the expert's testimony is based upon facts sufficient to form the basis for an opinion, the trier of fact determines its probative value") (citation omitted)); *see also Madden v. Cox*, 284 S.C. 574, 583, 328 S.E.2d 108, 114 (Ct. App. 1985) (stating an appellate court cannot judge the credibility or weight that should be given expert testimony, as these considerations are for the jury) (citation omitted)). In addition to Corey's testimony, DSS's employees testified that DSS failed to conduct *any* investigation into the medication during its post-EPC investigation, even though they claimed they based their decision to remove the children on the medicine. Even DSS's own expert testified that the children's post-EPC removal from the home was unlawful. Thus, there was additional, independent evidence that DSS acted in a grossly negligent fashion with respect to this investigation.

In sum, we agree with Petitioners that the court of appeals applied the wrong analysis, and in doing so, acted outside its limited scope of review. Rather than examining the record to discern whether there was any evidence put forward at trial to support the jury verdict, the court of appeals seems to have searched the record for evidence to corroborate DSS's theory of the case—that it acted with slight care. However, even though DSS presented some evidence that it acted with slight care regarding certain aspects of its investigation, especially in the pre-EPC removal setting, there was likewise ample evidence in the record that DSS acted with gross negligence with respect to the post-EPC investigation—or lack thereof. Accordingly, we cannot say that the record was devoid of evidence to support the jury's verdict, and we reverse the court of appeals.

## II. Outrage

Next, Petitioners contend the court of appeals' misapprehended the scope of their outrage claim because that claim was not limited to the initial improper removal of the children, but involved Petitioners' averments that they were subjected to reckless, cruel, inhumane, and unwarranted family disruption over a period of eight months following the return of the children to the home. We disagree with Petitioners that the evidence supported a verdict in their favor for the outrage claim.

To recover for outrage—otherwise known as intentional infliction of emotional distress—a plaintiff must establish the following:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct;
>
> (2) the conduct was so "extreme and outrageous" so as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community;"
>
> (3) the actions of the defendant caused plaintiff's emotional distress; and
>
> (4) the emotional distress suffered by the plaintiff was "severe" such that "no reasonable man could be expected to endure it."

*Argoe v. Three Rivers Behavioral Health, L.L.C.*, 392 S.C. 462, 475, 710 S.E.2d 67, 74 (2011) (quoting *Hansson v. Scalise Builders of S.C.*, 374 S.C. 352, 356, 650 S.E.2d 68, 70 (2007)).  In *Hansson*, this Court stated:

> Under the heightened standard of proof for emotional distress claims emphasized in *Ford,* a party cannot establish a prima facie claim for damages resulting from a defendant's tortious conduct with mere bald assertions. To permit a plaintiff to legitimately state a cause of action by simply alleging, "I suffered emotional distress" would be irreconcilable with this Court's development of the law in this area. In the words of Justice Littlejohn, the court must look for something "more"—in the form of third party witness testimony and other corroborating evidence—in order to make a prima facie showing of "severe" emotional distress.

374 S.C. at 358–59, 650 S.E.2d at 72 (citing *Ford v. Hutson*, 276 S.C. 157, 276 S.E.2d 776 (1981)).

There is no evidence in the Record that DSS's conduct was so "extreme and outrageous" that it exceeded "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community." *Id.*; *see, e.g.*, *Gattison v. S.C. State Coll.*, 318 S.C. 148, 157, 456 S.E.2d 414, 419 (Ct. App. 1995) (stating "these facts do not rise to the level required for outrage in South Carolina" because the plaintiff "has shown no hostile or abusive encounters, or coercive or oppressive conduct," even though the facts demonstrated "unprofessional, inappropriate behavior").  Thus, even considering the eight-month time period during which DSS continued to have contact with the Bass family, the evidence does not support the verdict as to the outrage cause of action.

However, because the jury was provided with (and neither party objected to) a general verdict form and because we have upheld the gross negligence finding, we reverse the court of appeals and reinstate the verdict.  *See, e.g.*, *Anderson v. West,* 270 S.C. 184, 241 S.E.2d 551 (1978) (where a case is submitted to the jury on two or more issues and a general verdict is returned, the verdict will be upheld if the verdict is supported by at least one issue); *see also Harold Tyner Dev. Builders, Inc. v. Firstmark Dev. Corp.*, 311 S.C. 447, 429 S.E.2d 819 (Ct. App. 1993) (same); *Dwyer v. Tom Jenkins Realty*, 289 S.C. 118, 120, 344 S.E.2d 886, 888 (Ct. App. 1986) ("Where a decision is based on two grounds, either of which,

independent of the other, is sufficient to support it, it will not be reversed on appeal because one of those grounds is erroneous" (quoting 5 Am. Jur. 2d *Appeal & Error* § 727 (1962)); *id.* ("[E]rroneous findings by the trial court . . . are [not] reversible error where the inclusion of such findings . . . would not change the judgment . . ." (quoting 5 Am. Jur. 2d *Appeal & Error* § 819 (1962)).[11]

## CONCLUSION

For the foregoing reasons, the decision of the court of appeals is

**REVERSED.**

**PLEICONES, BEATTY, KITTREDGE and HEARN, JJ., concur.**

---

[11] We reinstate the verdict subject to the trial court's reduction of the award in accordance with the TCA's limitations on damages.