LOCKEMY, C.J.:
**411 Christy Byrd, as next friend of Julia B., a minor, appeals a trial court order denying her motion for a new trial and/or judgment notwithstanding the verdict (JNOV), arguing the trial court erred in declining to find the obstetric emergency statute inapplicable to this case as a matter of law. We affirm.
FACTS
Christy Byrd brought this medical malpractice action on behalf of Julia B., her minor daughter, alleging Dr. John B. Browning, her obstetrician, breached the standard of care in his October 8, 2009 delivery of Julia. During the delivery, Julia presented with shoulder dystocia when her shoulder *154 became stuck under her mother's pubic bone. Byrd alleges Dr. Browning failed to properly manage and resolve Julia's shoulder dystocia during delivery, which resulted in a permanent brachial plexus nerve injury to Julia's right arm.
On March 12, 2013, Byrd filed a summons and complaint on Julia's behalf against Dr. Browning and McLeod Physician Associates, Inc. (collectively Respondents).[1] Respondents answered with general denials and asserted the affirmative defense of the emergency obstetrical care exception found in section 15-32-230 of the South Carolina Code (Supp. 2018). Respondents later amended their answer to assert the solicitation of charitable funds act defense. At the close of Respondents' case, Byrd moved for a directed verdict, arguing the obstetric emergency affirmative defense did not apply to the case as a matter of law because
no witness has offered testimony as to the necessary elements, which include medical instability, immediate threat **412 of death or harm. Neither of these two of the three elements have been satisfied. The only testimony that has come in on that has come in in direct contradiction of - - of witnesses' own sworn testimony.
The trial court denied Byrd's motion. The trial court charged the jury as follows concerning section 15-32-230 :
In an action involving medical malpractice - in a medical malpractice claim arising out of care rendered in a genuine emergency situation in an obstetrician suite where the patient is not stable and there is an immediate threat of death or serious bodily harm to the patient, no physician may be held liable unless it is proven that the physician was grossly negligent. In regards to this emergency exception, the defendants must prove this by the preponderance or greater weight of the evidence.
In addition, the verdict form given to the jury, which neither party objected to, provided:
1. Did the defendants prove by a greater weight or preponderance of the evidence that the facts of this case did arise out of a genuine emergency situation where the patient is not medically stable and there is an immediate threat of death or serious bodily injury?
The jury answered this question in the affirmative. In addition, the jury determined Dr. Browning was not grossly negligent. Byrd filed a motion for a new trial absolute and/or judgment notwithstanding the verdict, which the trial court denied in an order dated July 11, 2016. This appeal followed.
STANDARD OF REVIEW
"In an action at law, on appeal of a case tried by a jury, the jurisdiction of the appellate court extends merely to the correction of errors of law, and a factual finding by the jury will not be disturbed unless a review of the record discloses there is no evidence which reasonably supports the jury's findings." Wright v. Craft , 372 S.C. 1, 18, 640 S.E.2d 486, 495 (Ct. App. 2006).
"When reviewing a motion for directed verdict or JNOV, an appellate court must employ the same standard as the trial court." Id . "Motions for directed verdict or JNOV should be denied if the evidence yields more than one reasonable **413 inference or its inference is in doubt." Allegro, Inc. v. Scully , 418 S.C. 24, 32, 791 S.E.2d 140, 144 (2016) (citations omitted). "An appellate court will reverse the trial court's ruling only if no evidence supports the ruling below." Id .
The denial of a motion for a new trial absolute or a new trial nisi for excessiveness of the verdict is a matter within the sound discretion of the trial judge. The appellate court has no power to review his ruling unless it is wholly unsupported by the evidence or is controlled by an error of law.
Soaper v. Hope Indus., Inc. , 306 S.C. 531, 534, 413 S.E.2d 38, 40 (Ct. App. 1992), aff'd *155 as modified , 309 S.C. 438, 424 S.E.2d 493 (1992) (citations omitted).
LAW/ANALYSIS
Byrd argues the trial court erred in not finding the obstetric emergency exception is inapplicable to this case as a matter of law. The obstetric emergency exception is contained in section 15-32-230 of the South Carolina Code (Supp. 2018) and provides as follows:
(A) In an action involving a medical malpractice claim arising out of care rendered in a genuine emergency situation involving an immediate threat of death or serious bodily injury to the patient receiving care in an emergency department or in an obstetrical or surgical suite, no physician may be held liable unless it is proven that the physician was grossly negligent.
(B) In an action involving a medical malpractice claim arising out of obstetrical care rendered by a physician on an emergency basis when there is no previous doctor/patient relationship between the physician or a member of his practice with a patient or the patient has not received prenatal care, such physician is not liable unless it is proven such physician is grossly negligent.
(C) The limitation on physician liability established by subsections (A) and (B) shall only apply if the patient is not medically stable and:
(1) in immediate threat of death; or
(2) in immediate threat of serious bodily injury.
Further, the limitation on physician liability established by subsections (A) and (B) shall only apply to care rendered **414 prior to the patient's discharge from the emergency department or obstetrical or surgical suite.
We agree with Byrd's assessment that section 15-32-230 is in derogation of the common law. Therefore, we must adhere to the rule of strict construction of this statute. See Eades v. Palmetto Cardiovascular & Thoracic, PA , 422 S.C. 196, 201, 810 S.E.2d 848, 850 (2018) ("Statutes in derogation of the common law are to be strictly construed."). "Under this rule, a statute restricting the common law will not be extended beyond the clear intent of the legislature. Statutes limiting a claimant's right to bring suit are subject to this rule." Id . (citations omitted) (internal quotations omitted). We also agree with Byrd's interpretation that under a strict construction of the statute, the physician must prove all of the three required elements: (1) the claim arises out of a genuine emergency situation, (2) the patient is not medically stable, and (3) the patient was under an immediate threat of death or serious bodily injury.
Byrd concedes shoulder dystocia is a genuine emergency situation. However, Byrd argues Respondents failed as a matter of law to satisfy the two remaining elements. Specifically, Byrd relies on data collected from the fetal heart monitoring strips, Apgar scores[2] , and cord blood gases to support a finding of medical stability and argues these test results did not indicate an immediate threat of death or serious bodily harm. Byrd's experts, citing to this data, opined Julia was medically stable during the delivery.
Many of Respondents' experts, however, opined that shoulder dystocia is by its nature a medically unstable condition. Dr. Stacy Smithson testified the "most risky time during any birth is from the time the head is delivered until the time the remainder of the body is being delivered." He acknowledged in his deposition testimony read into the record, "from the medical record ... [t]he baby seemed fine." He noted the fetal monitoring strips did not suggest the baby was medically unstable. He also acknowledged the Apgar scores were fine. However, he testified, "[t]he blood gases revealed some minor **415 abnormalities, but in hindsight we can say that the baby was medically stable. In the midst of a delivery, you cannot say that." In addition, he testified: "This baby was at a threat of immediate risk of brain damage and death the entire time the baby was stuck." *156 Respondents' expert, Dr. Joseph Mack Ernest, testified as follows:
Q: When you are delivering a baby and you encounter shoulder dystocia, is that a medically stable or an unstable situation?
A: Well, it depends on how you define medically stable, and I was - - we discussed this in my deposition and I think it's important. It's an important concept.
If you talk about a particular part of the baby, is the heart rate stable? Well, the baby's heart rate was stable; so there was a medically stable heart rate. If you talk about the brain, during the 45 seconds of this delivery, the baby's brain was medically stable, but if you look at the big picture, it was a medically unstable condition.
Dr. Ernest then explained "medical stability" by describing a scenario in which he trips, cuts his forehead, and starts bleeding from an artery:
I'm talking to you. I can walk. I can breathe. My heart rate is okay, but I'm bleeding and it - and it's not stopping. At a point, I could die from that bleeding.
...
Q: So do you have an opinion whether there is an immediate risk of harm when presented with the medical emergency of shoulder dystocia ?
A: Definitions are everything right? And how do we define immediate? If immediate is if you don't fix it in a few minutes, there will be brain injury or death, then absolutely, and that's the situation. So I think most people would consider if you are at risk of dying unless something is done in 4 to 5 minutes that was immediate, yeah, I think it's an immediate risk.
Dr. Ernest later stated, "If you talk about the global picture, there was a medical instability because the baby has a **416 limited amount of oxygen, it was being used up, and the situation had to be fixed promptly."
Respondents' pediatric neurology expert, Dr. Michael Duchowny, testified as to the risk to a baby from lack of oxygen during a shoulder dystocia.
Q: It's your opinion obstetricians have over 5 to 6 minutes of lack of oxygen until there's a risk to the baby true?
A: In general, that's true, but there are two points to make here. One is that, firstly, it's different for every baby and, secondly, it's a continuum. It's not like suddenly a switch gets thrown at six minutes to say that you're in the danger zone. The longer the period of time that any of us are without oxygen, the higher the likelihood of some type of brain injury.
...
Q: And there was no indication in this case that either mother or baby were not medically stable; true?
A: They were unstable. Any situation where a baby is hung up in the birth canal is potentially a very dangerous situation and it is one that presents an immediate danger of bodily harm of either - - either morbidity, brain injury or death.
We must uphold the trial court's denial of Byrd's motion for a new trial absolute and or judgment notwithstanding the verdict if we find any evidence in the record purporting to satisfy these two remaining elements. Here, the experts seem to agree the data from the fetal heart monitoring strips, Apgar scores, and cord blood gases indicated stability. However, Respondents' experts testified medical stability is not based on this information alone. Respondents' experts view shoulder dystocia as a medically unstable situation because if the baby is not delivered, lack of oxygen to can lead to a brain injury or death.
As we explained in Small v. Pioneer Machinery, Inc. , 329 S.C. 448, 465, 494 S.E.2d 835, 843-44 (Ct. App. 1997),
[i]n a law case tried before a jury, it is the jury that must decide what part of the witness's testimony it wants to believe and what part it wants to disbelieve. Under such **417 circumstances, it is not the function of this [c]ourt to weigh the evidence and determine the credibility of the witnesses.
*157 While Byrd does not agree with Respondents' view of what constitutes medical stability, this view is contained in the record and provides a basis from which a jury could determine the requirements of section 15-32-230 were met.
Byrd asserts Dr. Browning admitted he did not believe Byrd or Julia were under an immediate threat of serious injury or death and he thought they were medically stable during the delivery. Byrd cites to Dr. Browning's testimony during cross-examination.
Q: This child was never at immediate threat of brain damage in those 45 seconds, was she?
A: No, but you're not - - what you're thinking is to resolve this right away in a correct fashion.
Q: No patient was at risk or at immediate threat of death or serious permanent - - or serious bodily injury during those 45 seconds; true?
A: Well, at the very start of recognizing the shoulder dystocia, that threat of brain injury, that threat of death is there. You go through your motions. You're not looking at the clock to resolve that problem.
Q: But there's no immediate threat for at least five to seven minutes; true?
A: Well, I would say that when you start getting over two or three minutes, there's an increasing risk of problems.
Q: But in the first 45 seconds, there's no immediate threat of any serious harm; true?
A: True.
However, on direct examination by Respondents' counsel, Dr. Browning testified he did not believe the patient was medically stable. Dr. Browning also testified, "[T]he more time it takes to resolve the shoulder dystocia, the more risk of having gradual incremental brain injury and then death."
"[N]either an appellate court nor the trial court has authority to decide credibility issues or to resolve conflicts in the testimony or the evidence."
**418 Bass v. S.C. Dep't of Soc. Servs. , 414 S.C. 558, 570, 780 S.E.2d 252, 258 (2015). While Byrd argues Dr. Browning's testimony was inconsistent, these inconsistencies were for the jury, not the court, to resolve.
Byrd also asserts Respondents' expert misinterpreted the meaning of the term "medically stable" as used in section 15-32-230. Byrd refers to Dr. Ernest's testimony previously cited. Byrd argues that particular definition is too broad. We agree, under Dr. Ernest's definition of medical stability, a patient would never be medically stable in any "emergency situation." A medical emergency by its nature would not be an emergency if it did not have the potential for the patient to become medically unstable and pose a risk of serious bodily injury or death. Nevertheless, Byrd failed to present this argument to the trial court and presents it for the first time on appeal.
"[A]n issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review." Wilder Corp. v. Wilke , 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998). Furthermore, "a party cannot argue one ground at trial then another ground on appeal" State v. McCray , 332 S.C. 536, 542, 506 S.E.2d 301, 303 (1998) (citing State v. Byram , 326 S.C. 107, 113, 485 S.E.2d 360, 363 (1997) ).
Byrd voiced agreement with the jury charge on the emergency medical and obstetrical care statute. Byrd insisted the charge make clear this provision is an affirmative defense and the charge include the definition of gross negligence. Byrd pressed the trial court to include the "not medically stable" requirement in the charge and the verdict form. Byrd, however, did not request the charge provide a definition of "medical stability" or otherwise object to the charge. Moreover, in her motion for a new trial or JNOV, Byrd argued the record lacked competent testimony to establish the elements of the defense. Byrd's motion did not make any arguments relating to the definition of "medical stability." Because Byrd did not object to the jury charges or the verdict form and argued a different ground on appeal than at trial, we agree with Respondents that this argument is not preserved for our review.
**419 *158 CONCLUSION
For these reasons, the trial court acted within its discretion in denying Byrd's motion for a new trial absolute and or judgment notwithstanding the verdict. Therefore, the trial court's order is
AFFIRMED.
SHORT and MCDONALD, JJ., concur.

Byrd initially sued McLeod Physician Associates, Inc., but during the course of the trial, the trial court determined McLeod Physician Associates II was Dr. Browning's employer at the time of the delivery. As such, McLeod Physician Associates, Inc. was replaced with McLeod Physician Associates II as the co-defendant in this case.

According to Byrd's obstetric and forensic medicine expert, Apgar scores are given to the baby after delivery based on the baby's color, breathing, tone, movement, respiratory rate, and heart rate.