**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Richard Ciampanella, Respondent,

v.

City of Myrtle Beach, Appellant.

Appellate Case No. 2018-002270

---

Appeal From Horry County
Thomas A. Russo, Circuit Court Judge

---

Unpublished Opinion No. 2022-UP-085
Heard October 21, 2021 – Filed March 2, 2022

---

**AFFIRMED**

---

Amy Lynn Neuschafer, of Collins & Lacy, PC, of
Murrells Inlet, for Appellant.

Gene McCain Connell, Jr., of Kelaher Connell &
Connor, PC, of Surfside Beach, and Julian Zeno Hanna,
of Julian Z. Hanna & Assoc., PA, of Pawleys Island, both
for Respondent.

---

**PER CURIAM:** The City of Myrtle Beach (the City) argues the circuit court
erred in granting Richard Ciampanella's motion for a new trial in this gross

negligence action, asserting Ciampanella failed to present evidence of the standard of care or any breach of the standard of care.  We affirm.

**Facts and Procedural History**

On August 19, 2014, Ciampanella was vacationing in Myrtle Beach with his family when he fell from a public access beach walkover at 77th Avenue North after the rail he was leaning on gave way.  Ciampanella returned to his hotel room and called EMS around 11:30 p.m.

EMS transported Ciampanella to Grand Strand Regional Hospital, where he was diagnosed with a fractured vertebrae.  As a result of this injury, Ciampanella incurred $16,508.90 in medical expenses.  Following his discharge from the hospital, Ciampanella completed a loss report with the City.

Ciampanella subsequently filed this action, alleging the City was negligent in constructing, designing, and maintaining the boardwalk walkover.  The City timely answered, raising among its defenses various provisions of the South Carolina Tort Claims Act[1] and the South Carolina Recreational Use Statute (the RUS).[2]

The case was tried January 23–25, 2017.  At the close of Ciampanella's case, the City moved for a directed verdict, arguing the RUS required a showing of gross negligence and Ciampanella lacked evidence of the City's failure to exercise slight care in maintaining the boardwalk.  The City further argued the applicable Tort Claims Act exceptions required proof of gross negligence.  Ciampanella agreed that if the circuit court found the RUS applied, the gross negligence standard would apply.  Ultimately, the circuit court directed a verdict in favor of the City.

Ciampanella timely moved for a new trial under Rule 59, SCRCP.  The circuit court granted Ciampanella's motion for a new trial as to "any and all causes of action related to negligent design and/or construction."  The circuit court's holding that the RUS precluded a finding of simple negligence was unaffected by the new trial order, and the circuit court found "issues related to the City's inspection schedule, inspection methodology, and claims related to the adequacy of the City's preventative and corrective maintenance subsequent to original construction shall <u>not</u> be addressed during the new trial."

---

[1] S.C. Code Ann. § 15-78-10 to -220 (2005 & Supp. 2021).

[2] S.C. Code Ann. § 27-3-10 to -70 (2007 & Supp. 2021).

The City moved to reconsider under Rule 59(e), SCRCP, arguing Ciampanella failed to present any evidence of the design and/or building code in effect at the time of the boardwalk's construction. The City asserted, "In the absence of evidence of the standard of care owed at the time of original construction and the absence of evidence from which a jury could find gross negligence (or even simple negligence) in the City's design or construction," the circuit court should reconsider its order granting Ciampanella a new trial. The circuit court denied the City's motion to reconsider.

**Law and Analysis**

The City argues the circuit court erred in granting a new trial after it directed a verdict at trial because Ciampanella failed to present evidence of the standard of care or that the City breached the standard of care in constructing or designing the walkover. We disagree.

"Negligence is the failure to exercise due care, while gross negligence is the failure to exercise slight care." *Proctor v. Dep't of Health & Env't Control*, 368 S.C. 279, 294, 628 S.E.2d 496, 504 (Ct. App. 2006) (quoting *Clyburn v. Sumter Cnty. Sch. Dist. No. 17*, 317 S.C. 50, 53, 451 S.E.2d 885, 887 (1994)). "Gross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." *Bass v. S.C. Dep't of Soc. Servs.*, 414 S.C. 558, 571, 780 S.E.2d 252, 258–59 (2015) (quoting *Etheredge v. Richland Sch. Dist. One*, 341 S.C. 307, 310, 534 S.E.2d 275, 277 (2000)). "Normally, the question of what activity constitutes gross negligence is a mixed question of law and fact. However, 'when the evidence supports but one reasonable inference, the question becomes a matter of law for the court.'" *Id.* (citation omitted) (quoting *Etheredge*, 341 S.C. at 310, 534 S.E.2d at 277).

"The factfinder may consider relevant standards of care from various sources in determining whether a defendant breached a duty owed to an injured person in a negligence case. The standard of care in a given case may be established and defined by the common law, statutes, administrative regulations, industry standards, or a defendant's own policies and guidelines." *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 140, 638 S.E.2d 650, 659 (2006). "Evidence of industry standards, customs, and practices is 'often highly probative when defining a standard of care.'" *Elledge v. Richland/Lexington Sch. Dist. Five*, 341 S.C. 473, 477, 534 S.E.2d 289, 290 (Ct. App. 2000) (quoting 57A Am.Jur.2d Negligence § 185 (1999)), *aff'd*, 352 S.C. 179, 573 S.E.2d 789 (2002).

In his deposition, Richard Kirby, the City's park superintendent, testified he was unsure exactly when the City constructed the 77th North Avenue walkover, but he believed it was likely in 1990, following Hurricane Hugo.

Engineer Alan Campbell was qualified as plaintiff's expert witness without objection. Campbell identified Plaintiff's Exhibits 24 and 32 as standard guidelines from the South Carolina Department of Health and Environmental Control Office of Coastal Resource Management (OCRM) that provided recommendations for constructing beach walkovers. Campbell testified these guidelines recommend the use of half-inch bolts instead of number 9 screws, which are three-sixteenths of an inch in diameter. On cross-examination, Campbell admitted the diagrams "are published as a guideline through OCRM" but he could not say who initially drafted them. The guidelines are not a mandate or directive to municipalities, but "a starting point. You can call it conceptual design, you can call it something to go by. You can make modifications as long as they satisfy building code requirements, industry standards and construction guidelines."

Campbell testified the construction guidelines in 1990 would have been very similar to those presented at trial. He explained, "We've got some probably more advanced coatings and materials that we can use. But for the most part, regarding bolts, large diameter bolts as opposed to small diameter screws, treated wood, the layout, the rail construction, very, very similar with very, very minimal changes."

We acknowledge that without more, any standards promulgated after the walkover was built are irrelevant to the consideration of the standard of care at the time the walkover was built. *See Creech v. S.C. Wildlife & Marine Res. Dep't*, 328 S.C. 24, 35, 491 S.E.2d 571, 576 (1997) (holding certain manuals and guidelines regarding the construction of docks were irrelevant to the question of negligence when they were not created until after the construction of the dock at issue). However, Campbell testified the industry standards introduced into evidence were "very, very similar" to those in place when the walkover was constructed "with very, very minimal changes." He agreed it would be correct to say that "the codes have been updated a little bit, but the basic safety structures remain [sic] the same since the 1980s."

Campbell further testified that section 304-12 of the International Property Maintenance Code required handrails and guardrails to "be firmly fastened and capable of supporting normally imposed loads and shall be maintained in good condition." According to Campbell, handrails must be designed to be able to

withstand a concentrated load of 200 pounds.  He explained that a 30 or 40 pound load would have been exerted when Ciampanella leaned on the rail.  Campbell opined the City did not construct the walkover with the ability to withstand a 200 pound force.

Campbell's testimony regarding these building standards and load requirements set forth the standard of care applicable to the design and construction of the walkover.  Through Campbell, Ciampanella also presented evidence from which a jury could find the City breached the standard of care.  Campbell testified that using half-inch lag bolts was preferable for such construction, but he admitted that using number 9 screws, as the City had, could be acceptable under certain circumstances.  However, Campbell clarified the screws require "a very, very high maintenance schedule because of the fast rate of corrosion.  So the fact that the screws would deteriorate so quickly, then they either need to maintain it on a regular basis or construct it in a much stronger manner using bolts instead of screws."  He explained that because the screws do not "last very long, it's not recommended.  And if they do, if you use those, you've got to replace them very frequently.  They're just not recommended.  You should use something much larger in diameter with a heavier galvanized coating."  According to Campbell, the lag bolts "would have been much larger diameter, a half-inch diameter, and they would have penetrated all the way through the post.  So they would have gone in one side, with the head of the bolt on one side, and the nut with a washer on the other side."  Campbell explained the smaller diameter screws would deteriorate more quickly than larger bolts, and the rail showed evidence of "extensive corrosion."  Such corrosion showed an "absence of proper maintenance and *absence of good construction*." (emphasis added).

Campbell admitted there could be "levels of acceptable construction practices."  He stated that if the City used nine to twelve number 9 screws on the walkover, such would have been appropriate so long as the City properly maintained and inspected the construction.  He admitted the load for this number of screws could be close to 200 pounds, answering:

> Q     So with those three screws together, the original construction meets your 200 pounds of concentrated force requirement; yes?
>
> A     On day one?
>
> Q     Yeah.

A     Yes, sir.

This evidence supports the circuit court's grant of a new trial on Ciampanella's theory that the City failed to exercise slight care in constructing the walkover by using small-diameter screws prone to corrosion in a beach environment, as opposed to lag bolts that would be more secure long-term.  Thus, the circuit court did not abuse its discretion in granting Ciampanella's motion for a new trial.  *See Brinkley v. S.C. Dep't of Corr.*, 386 S.C. 182, 185, 687 S.E.2d 54, 56 (Ct. App. 2009) ("The grant or denial of new trial motions rests within the discretion of the circuit court, and its decision will not be disturbed on appeal unless its findings are wholly unsupported by the evidence or the conclusions reached are controlled by error of law."); *id.* at 188, 687 S.E.2d at 57 ("[O]ur standard of review dictates that we must only look to see if there is evidence in the record to support the circuit court's decision to grant a new trial, and, only in the complete absence of such evidence, is it within our province to find the circuit court abused its discretion.").

**AFFIRMED.**

**WILLIAMS, C.J., MCDONALD, J., and LOCKEMY, A.J., concur.**