# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Phillippa Smalling, individually and as Next Friend for Jahmerican M., a minor, Appellant,

v.

Lisa R. Maselli, M.D., both individually and as agent/employee of Carolina OB-GYN, Respondent.

Appellate Case No. 2019-001304

Appeal From Georgetown County
Larry B. Hyman, Jr., Circuit Court Judge

Opinion No. 5949
Heard October 3, 2022 – Filed November 2, 2022

**AFFIRMED**

Edward L. Graham, of Graham Law Firm, PA, of Pendleton, for Appellant.

James Bernard Hood and John O'Connor Radeck, Jr., of Hood Law Firm, LLC, of Charleston, and Deborah Harrison Sheffield, of Hood Law Firm, LLC, of Columbia, all for Respondent.

**MCDONALD, J.:** Phillippa Smalling, individually and as Next Friend for Jahmerican M., a minor, brought this medical malpractice action against Dr. Lisa Maselli for injuries suffered by Minor during his birth. Smalling challenges the circuit court's application of section 15-32-230 of the South Carolina Code (Supp.

2022), which requires gross negligence to impose liability in certain emergency and obstetrical care situations.  We affirm.

**Facts and Procedural History**

In 2012, Smalling (Mother) received prenatal care at Carolina OB-GYN. Following an uncomplicated pregnancy, Mother was admitted to Georgetown Memorial Hospital for labor and delivery at 2:00 a.m. on April 27, 2013.

Mother reached ten centimeters dilation at 7:59 a.m. and began pushing.[1]  At 8:14 a.m., Minor's head delivered with a nuchal cord.[2]  Although Dr. Maselli was able to reduce the cord, she immediately realized Minor's top shoulder was stuck under Mother's pubic bone, signaling shoulder dystocia, an obstetric emergency.[3]  Dr. Maselli called for a second labor and delivery nurse to assist, and the nurses performed a McRoberts maneuver by hyperflexing Mother's hips.  When the next push did not resolve the shoulder dystocia, Dr. Maselli performed a mediolateral episiotomy.  While the nurses applied suprapubic pressure, Dr. Maselli used "moderate/controlled" traction to successfully release the shoulder and complete Minor's delivery.

Due to the relatively quick delivery—sixty seconds elapsed from the delivery of the baby's head to the delivery of the body—Minor suffered no hypoxic injury from oxygen deprivation.  However, Minor did suffer a brachial plexus injury.  Dr. Maselli's "shoulder dystocia progress note" referenced minimal movement of Minor's right arm but noted the baby's right hand and fingers were moving.  A subsequent MRI revealed Minor's C-5 and C-6 nerve roots were completely avulsed from his spinal cord, and his C-7 nerve root was partially avulsed. Although Minor underwent multiple surgeries and extensive rehabilitative therapy,

---

[1] Dr. Maselli and a labor and delivery nurse were in the delivery room with Mother at this stage.  Pediatrician David Haseltine joined them to provide deep suction once Minor was delivered due to the presence of meconium in the amniotic fluid.

[2] A "nuchal cord" refers to a condition in which the umbilical cord is wrapped around the baby's neck.  In this context, "reduce" means to release the umbilical cord over the baby's head.

[3] Mother's expert, Dr. Stephen Pliskow testified, "With shoulder dystocia, the head comes out and the baby gets stuck.  The shoulders, which is the next part to come out after the head, doesn't come out; it's stuck by the bony structures of the pelvis."

he has permanent and significant loss of right arm function, and his right arm is shorter than his left due to muscle atrophy.

In response to Mother's medical malpractice complaint, Dr. Maselli raised section 15-32-230's limitation on liability, which requires a showing of gross negligence. Mother later moved for partial summary judgment seeking to preclude the defensive application of § 15-32-230(A), which pertains to claims arising from "care rendered in a genuine emergency situation involving an immediate threat of death or serious bodily injury to the patient receiving care in an emergency department or in an obstetrical or surgical suite." The circuit court denied Mother's motion for partial summary judgment and accompanying motion to stay.

At the close of Mother's case at trial, Dr. Maselli moved for a directed verdict. The circuit court denied the motion as to liability but directed a verdict on punitive damages. Dr. Maselli renewed the directed verdict motion as to liability at the close of her case. Mother also sought a partial directed verdict, again seeking to preclude the application of § 15-32-230(A). The circuit court denied the motions.

The circuit court's jury charges included the relevant language of § 15-23-230 and a standard medical malpractice hindsight charge. The circuit court denied Mother's request to charge the language of § 15-23-230(B), which addresses claims relating to "obstetrical care rendered by a physician on an emergency basis when there is no previous doctor/patient relationship . . . or the patient has not received prenatal care," finding this subsection inapplicable to the circumstances of Minor's delivery. Without objection, the circuit court submitted a verdict form with special interrogatories addressing the required elements of § 15-23-230(C). Although the jury was unable to reach a unanimous verdict as to the first two questions on the verdict form, it was unanimous as to the remaining questions and sought to return a verdict for Dr. Maselli on that basis. Over Mother's objection, the circuit court accepted the defense verdict.

**Standard of Review**

"When reviewing a motion for directed verdict or JNOV, an appellate court must employ the same standard as the trial court." *Byrd as Next Friend of Julia B. v. McLeod Physician Assocs. II*, 427 S.C. 407, 412–13, 831 S.E.2d 152, 154 (Ct. App. 2019) (quoting *Wright v. Craft*, 372 S.C.1, 18, 640 S.E.2d 486, 495 (Ct. App. 2006)). "[W]e reverse only when there is no evidence to support the ruling or when the ruling is governed by an error of law.'" *Austin v. Stokes-Craven Holding Corp.*, 387 S.C. 22, 42, 691 S.E.2d 135, 145 (2010)). "Statutory interpretation is a

question of law," which this court reviews de novo. *Flowers v. Giep*, 436 S.C. 281, 285–86, 871 S.E.2d 607 (Ct. App. 2021), *cert. denied* (Sept. 7, 2022).

**Law and Analysis**

**I. Directed Verdict and Applicability of Subsections (A) and (B)**

Mother argues the circuit court erred in denying her motion for a partial directed verdict, which essentially sought a declaration that section 15-32-230(A)'s gross negligence standard was inapplicable to the circumstances of Minor's delivery. In furtherance of this argument, Mother asserts the General Assembly intended for subsections (A) and (B) to apply together. We disagree.

Section 15-32-230 provides:

> (A) In an action involving a medical malpractice claim arising out of care rendered in a genuine emergency situation involving an immediate threat of death or serious bodily injury to the patient receiving care in an emergency department or in an obstetrical or surgical suite, no physician may be held liable unless it is proven that the physician was grossly negligent.
>
> (B) In an action involving a medical malpractice claim arising out of obstetrical care rendered by a physician on an emergency basis when there is no previous doctor/patient relationship between the physician or a member of his practice with a patient or the patient has not received prenatal care, such physician is not liable unless it is proven such physician is grossly negligent.
>
> (C) The limitation on physician liability established by subsections (A) and (B) shall only apply if the patient is not medically stable and:
>
>> (1) in immediate threat of death; or
>>
>> (2) in immediate threat of serious bodily injury. Further, the limitation on physician liability established by subsections (A) and (B) shall only

apply to care rendered prior to the patient's discharge from the emergency department or obstetrical or surgical suite.

This court addressed subsections (A) and (B) in *Flowers*, finding "section 15-32-230 provides a defense against simple negligence in two separate and distinct scenarios." 436 S.C. at 288, 871 S.E.2d at 608.

From a plain reading of the text, we find subsection (A) describes a physician that encounters an emergency while providing care whereas subsection (B) describes a physician treating a patient previously unassociated with the physician or his or her practice or lacking prior prenatal care. Because subsections (A) and (B) describe different factual scenarios in which a physician might provide negligent care, we find the legislature intended subsection (B) to apply separately from subsection (A) rather than as a limitation to (A). Moreover, the language within subsection (B) neither indicates that it is a limitation on the defense provided in subsection (A) nor does it state that subsection (A) only provides a defense for obstetrical care if the requirements within subsection (B) are satisfied. To adopt Appellants' interpretation and read subsection (B) as a limitation to subsection (A) would be a "forced construction" of the text's plain language.

*Id.* at 287–88, 871 S.E.2d at 607–08 (internal citations omitted).

In an effort to avoid subsection (A)'s limitation on liability, Mother seeks to create an ambiguity through her reading of subsection (B). Although Mother also seeks to limit the application of *Flowers* to the particular facts of that case, we find its analysis applicable here as well. Subsection (B) is inapplicable to Mother's circumstances because Mother was an established patient of Carolina OB-GYN, where she received prenatal care. Accordingly, the circuit court properly denied Mother's motion for a partial directed verdict and properly declined her request to declare the gross negligence standard of § 15-32-230(A) inapplicable.

## II. Section 15-32-230(C)

Mother further argues the "emergency statute does not apply because, as a matter of law, there was no proof that this infant was 'not medically stable.'" In her reply brief, Mother clarifies this argument, contending that when certain undefined statutory terms are "properly construed, the statute does not apply as a matter of law." Mother correctly notes that for the emergency statute to apply, a physician "must prove all of the three required elements: (1) the claim arises out of a genuine emergency situation, (2) the patient is not medically stable, and (3) the patient was under an immediate threat of death or serious bodily injury." *Byrd*, 427 S.C. at 414, 831 S.E.2d at 155.

### A. Genuine Emergency and Immediate Threat

Mother contends the phrases "genuine emergency," "medically stable," and "immediate threat of death or serious bodily injury," are "ambiguous, in part, and must be construed to signify some factor other than conditions present in any medical emergency." However, because Mother raised only the element of medical instability in her argument on the record at trial, we find unpreserved her contentions that Minor's delivery did not involve a "genuine emergency" or an "immediate threat of death or serious bodily injury." *See Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) ("It is well-settled that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial court to be preserved for appellate review."); *State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003) ("A party may not argue one ground at trial and an alternate ground on appeal.").

### B. Not Medically Stable

Mother asserts Dr. Maselli's experts "provided no evidence whatsoever that *this patient*, in that moment, was medically unstable in a statutory sense." She relies on data collected from the fetal heart monitoring strips, Minor's Apgar scores,[4] and the non-problematic cord blood gases to support her medical stability argument, noting these test results indicated no immediate threat of death or serious bodily harm to Mother or Minor. Citing this data, Mother's experts, Dr. Adler and Dr. Pliskow, opined Mother and Minor were medically stable and there was no risk of injury during the sixty seconds it took Dr. Maselli to resolve the shoulder dystocia. Specifically, Dr. Pilskow testified that "more likely than not, the baby was stable

---

[4] "Apgar scores are given to the baby after delivery based on the baby's color, breathing, tone, movement, respiratory rate, and heart rate." *Byrd*, 427 S.C. at 414 n.2, 831 S.E.2d at 155 n.2.

coming in and stable coming out, would have been stable for at [sic] that one-minute period of time from [an] oxygen, acid based standpoint."

By contrast, Dr. Maselli's experts, Dr. Christopher Robinson and Dr. Suneet Chauhan, opined Minor was *not* medically stable and the risk posed by the shoulder dystocia was real and immediate. As Dr. Robinson explained, "You cannot be stable and not be able to breathe." He further noted the Apgar scores and cord blood gases demonstrated Dr. Maselli did a good job managing the delivery in preventing hypoxic injury or death, but such tests have no bearing on whether Minor was medically stable during the period of time his shoulder was stuck. Dr. Chauhan echoed this opinion, testifying, "to me this is a testament of their excellent clinical work in managing obstetrics."

As in *Byrd*, the experts here agreed the data from the fetal heart monitoring strips, Apgar scores, and cord blood gases indicated stability. 427 S.C. at 416, 831 S.E.2d at 156 (noting "the experts seem to agree the data from the fetal heart monitoring strips, Apgar scores, and cord blood gases indicated stability" but "medical stability is not based on this information alone."). However, Dr. Maselli's experts testified shoulder dystocia is a medically unstable situation because if the baby is not timely delivered, lack of oxygen can lead to brain injury or even death. *See id.* ("Respondents' experts view shoulder dystocia as a medically unstable situation because if the baby is not delivered, lack of oxygen [can] lead to a brain injury or death."). While Mother disagrees, these opinions provided a basis from which the jury could properly determine the necessary elements of § 15-32-230 were met. Thus, we find the circuit court properly considered the evidence at trial in conjunction with the requirements of the statute in submitting the case to the jury. *See id.* ("We must uphold the trial court's denial of Byrd's motion for a new trial absolute and or judgment notwithstanding the verdict if we find any evidence in the record purporting to satisfy these two remaining elements.").

**Conclusion**

For the foregoing reasons, the orders of the circuit court are

**AFFIRMED.**

**GEATHERS and HILL JJ., concur.**